Filed 12/12/14  Sternlib v. Story Lending CA2/3

*NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*

**California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b).  This opinion has not been certified for publication or ordered published for purposes of rule 977.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| RIKA STERNLIB et al., | B248260 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. LC085619) |
| v. | |
| STORY LENDING, LLC, | ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |
| Defendant and Appellant. | |

THE COURT:

It is ordered that the opinion filed herein on November 14, 2014, be modified as follows:

On page 13, footnote 7 is deleted and replaced with the following:

"In view of the evidence that Plaintiffs could not secure substitute financing due to Story's $1.6 million lien on the property, the trial court appropriately exercised its equitable discretion to cancel the deed of trust.  (See Civ. Code, § 3412.)  Be that as it may, regardless of which measure of damages the court applies on remand, the resulting judgment must account for repayment of all funds that Story has advanced to Plaintiffs."

There is no change in the judgment.

Filed 11/14/14  Sternlib v. Story Lending CA2/3 (unmodified version)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| RIKA STERNLIB et al., | B248260 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. LC085619) |
| v. | |
| STORY LENDING, LLC, | |
| Defendant and Appellant. | |

APPEAL from judgment of the Superior Court of Los Angeles County, Maria E. Stratton, Judge.  Affirmed in part, reversed in part with directions.

Law Offices of Robert D. Coppola, Jr. and Robert D. Coppola, Jr. for Defendant and Appellant.

Rogers & Harris and Michael Harris for Plaintiffs and Respondents.

_____

## INTRODUCTION

Defendant Story Lending, LLC (Story) appeals from a judgment entered after a bench trial awarding Plaintiffs Rika Sternlib and Joseph Sternlib damages for breach of a construction loan contract. We conclude the record supports the trial court's finding that Story breached the agreement by refusing to make an authorized loan disbursement when due. However, because the trial court applied an incorrect measure of damages, we will reverse the award and remand the case for a retrial on the damages issue.

## FACTS AND PROCEDURAL BACKGROUND

Plaintiffs Rika and Joseph Sternlib are husband and wife. In 2004, Rika Sternlib acquired two adjacent hillside lots for a purchase price of $575,500. For several years, Plaintiffs worked on a building plan for a residence on one of the lots. The plan was finally approved by the City of Los Angeles in October 2008.

In June 2008, Plaintiffs began looking for a loan to finance construction. Plaintiffs' broker contacted three lenders, but Story was the only one interested in the loan. Story makes "hard money loans," which rely primarily on the equity in the property pledged as security, rather than the borrower's credit history. These loans are customarily offered to borrowers who cannot qualify for a conventional loan.

In July 2008, while still seeking final approval from the City of Los Angeles, Plaintiffs had the property appraised twice in advance of closing the loan with Story. Based on preliminary plans for the residence, both appraisals valued the property at $2.25 million, even though the listed square footage differed by 240 square feet between the two appraisals.

On September 11, 2008, Plaintiffs entered into the loan agreement with Story. The loan agreement provides that "[u]pon Borrower's compliance with the requirements of Lender set forth in this Agreement, Lender shall advance to Borrower an amount not to exceed" $1,635,450. All funds advanced were to be "charged against Borrower's promissory note to Lender . . . in the original principal sum of" $1,635,450. The note was secured by a deed of trust, which Story recorded as a lien on the property.

2

Among the "Conditions Precedent for Advances" set forth in paragraph 2 of the loan agreement, subparagraph m provides: "Based on the required loan to value ratio determined by Lender prior to closing, Borrower's equity in the project, exclusive of any loan proceeds, must already be in the project or placed with Lender, before Lender shall have any obligation to fund the Loan or any part thereof. Further, Lender's loan to value requirements must continue to be met and/or maintained throughout the entire construction phase of the Loan."

Additionally, subparagraphs k and l required Plaintiffs to submit a written draw request, together with "[a]ny consents, certificates of approval, . . . evidence of partial or final completion, . . . or such other documents as Lender may reasonably require" as further conditions precedent. According to the trial court's findings, these provisions required Plaintiffs to retain an independent third party to review and approve each phase of construction for every loan advance. Plaintiffs retained Builders Control Service Co. (Builders Control) for this purpose.

Escrow closed on September 27, 2008. Story tendered the first loan draw of $44,977.87 directly out of escrow by way of two checks made out to the Department of Building and Safety. The funds were earmarked to pay two large permit fees. Story also paid a $10,013 fee for Builders Control out of escrow. Thereafter, construction began.

In October 2008, Plaintiffs requested a second draw of $124,700. Builders Control approved the request; however, it was unable to disburse the funds to Plaintiffs due to a "problem" in Story's office. Ten days later, Story funded the second draw.

In November 2008, Plaintiffs requested a third draw of $125,000. Builders Control approved the request, but again was unable to disburse the funds, and directed Plaintiffs to speak with Story about the money. Plaintiffs spoke with Story's owner, Rev Karpman, who told them he needed to talk with his investors and partners before funding the advance. Two weeks later, Plaintiffs received a $125,000 check from Story. Karpman told them the check could be deposited in two days. As winter approached, Plaintiffs' goal was to complete the undergrade work on the project while the weather was good.

In December 2008 or January 2009, Plaintiffs requested a fourth draw of $164,000. Builders Control approved the request, but advised Plaintiffs that Story "had no money" and they would need to " 'go fight with Rev Karpman.' " Karpman told Plaintiffs he had "stopped the funding because he had no money; [as] he had lost it investing in Panama."

Plaintiffs told Karpman they needed to put in rebar and concrete immediately, before the rains came. After visiting the construction site, Karpman asked Plaintiffs what amount they needed to " 'stop the damage.' " Plaintiffs said they needed at least $70,000 to protect the site from the upcoming rainy season. Story tendered $30,000 on January 22, 2009, and an additional $20,000 on February 2, 2009. Plaintiffs purchased concrete and told Karpman they needed the remaining funds to pour it. Karpman told Plaintiffs that his partners would not let him release more money on the loan.

The next day, Karpman suggested Plaintiffs speak with a different lender to obtain another loan. Plaintiffs were not interested in another loan, as they had already paid points and fees to Story. However, because they could not stop construction, Plaintiffs spoke with two or three other lenders. The lenders were unwilling to make another loan due to Story's $1.6 million lien on the property.

Plaintiffs obtained small loans from family and friends to finish the rebar and concrete. However, Plaintiffs' building permits eventually expired. Thus, to recommence construction, Plaintiffs will be required to obtain all new permits and new approvals for the work that has been completed.

Plaintiffs sued Story for breach of the loan agreement. After a bench trial, the court issued a statement of decision finding "Story breached its loan agreement with [Plaintiffs] by failing to fund the construction loan as approved by Builders Control." With respect to damages, the court found Plaintiffs were entitled to "the reasonable cost of completing the work," less the amount "Plaintiffs currently owe defendant Story" for "the draws funded before [Story] breached the contract." Relying on an exhibit submitted by Plaintiffs showing "what it would currently cost to complete the construction," the trial court concluded Plaintiffs were entitled to a net award of

$276,473.13.  In light of the net award, the court also found it "equitable to cancel the deed of trust."

Story did not object to the statement of decision or move for a new trial.

## DISCUSSION

1.    *The Record Supports the Trial Court's Breach of Contract Determination*

As explained in its statement of decision, the trial court concluded Story breached the loan agreement by refusing to advance funds that were approved by Builders Control for the next phase of construction.  Though Story challenges this finding on several grounds, all essentially collapse into a single contention—namely, that Story had no obligation to make further advances if, at any time during the construction phase, the loan-to-value ratio exceeded a level determined by Story prior to closing.  We conclude Story has failed to establish reversible error.  As we shall explain, the court made a dispositive finding, based on an admission by Story's owner, that Story stopped making authorized loan advances due to a shortage of funds stemming from losses it suffered in an unrelated investment—not because of a problem with the loan-to-value ratio.

We begin with perhaps the most fundamental principle of appellate review—that a judgment is presumed correct, all inferences are indulged in its favor, and all ambiguities are resolved to support affirmance.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Winograd v. American Broadcasting Co*. (1998) 68 Cal.App.4th 624, 631.)  The appellant bears the burden of overcoming this presumption by presenting a record that affirmatively demonstrates error.  "Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant]."  (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502.)  Thus, for instance, where the appellant fails to provide a reporter's transcript, "it is presumed that the unreported trial testimony would demonstrate the absence of error."  (*Estate of Fain* (1999) 75 Cal.App.4th 973, 992; see also *Foust v. San Jose Construction Co., Inc*. (2011) 198 Cal.App.4th 181, 187 [affirming judgment where appellant included only selected excerpts from clerk's transcript and failed to include reporter's transcript or exhibits, preventing meaningful review].)

Furthermore, not every purported error sanctions a reversal. Pursuant to statute and constitutional mandate, no judgment may be reversed on the basis of an error unless the record demonstrates the error was "prejudicial" and caused the appellant "substantial injury," such that "a different result would have been probable if such error . . . had not occurred." (Code Civ. Proc., § 475; see also Cal. Const., art. VI, § 13.) Thus, "if there is a finding of fact that is dispositive and necessarily controls the judgment, the presence or absence of findings on other issues is inconsequential." (*Alpine Ins. Co. v. Planchon* (1999) 72 Cal.App.4th 1316, 1320 (*Alpine*).)

Story does not dispute that it refused to release all funds approved by Builders Control for Plaintiffs' fourth loan draw. Nevertheless, it contends this was not a breach, because its obligation to make further advances under the agreement was conditioned upon the original loan-to-value ratio being maintained throughout the construction phase of the loan. The trial court rejected this contention. Among other things, the court implicitly credited Mr. Sternlib's testimony that Story's owner, Karpman, admitted he "did not . . . [stop] the funding because of a loan to value problem," but rather "because he had no money; [as] he had lost it investing in Panama." The court's rejection of Story's loan-to-value ratio defense also is supported by the absence of any evidence— either discussed in the statement of decision or appearing in the appellate record supplied by Story—compelling a finding that the value of the property had diminished to the point

that it no longer supported the original loan-to-value ratio when Story refused to advance the funds.[1]

Story's arguments on appeal simply ignore this dispositive finding and thus fail to establish reversible error. (See *Alpine, supra,* 72 Cal.App.4th at p. 1320.) For instance, Story principally contends the trial court erred in concluding Story was required to determine a baseline loan-to-value ratio and communicate the ratio to Plaintiffs prior to closing. Contrary to the court's interpretation, Story argues there was no such requirement, because the loan-to-value ratio was "readily determinable" at closing from "the amount of the loan and the estimated value of the improvements" as stated in the appraisals.

Even if Story's interpretation is correct, there is no reversible error. For purposes of assessing prejudice, it makes no difference whether we construe the loan-to-value requirement as having been set by the ratio that existed at closing, because the trial court found Story's decision to refuse future funding was not supported by evidence of a loan-to-value problem. There is no evidence in the record presented by Story that compels a finding that the property lost value after the original ratio was established.

---

[1]     At most, the court's statement of decision refers to "a second appraisal dated later in the fall" of 2008, which Story attempted to introduce into evidence. The court did not admit the appraisal, as Story "was unable to lay a foundation." Story does not challenge this evidentiary ruling on appeal. It nevertheless claims the appraisal's "creation at the request of Story was established by in Court testimony." However, Story failed to supply a transcript or settled statement concerning such testimony, let alone identify any evidence showing the property diminished in value after the loan closed.

Story also points to testimony from Plaintiffs' construction superintendent, who claimed Karpman told him there were problems with the loan-to-value ratio. Regardless of whether Karpman made such a statement, the statement alone does not compel a finding that the property in fact diminished in value. Further, the trial court was free to disbelieve the superintendent's testimony, as the court impliedly did in rejecting Story's loan-to-value ratio defense.

For the same reason, Story's related argument that the trial court erred by considering extrinsic evidence fails to support reversal of the judgment. Citing isolated references in the court's statement of decision to "oral discussions" and what Plaintiffs "believed," Story argues the court improperly considered extrinsic evidence in determining the parties intended Builders Control to take charge of the entire loan commitment after escrow in order to make periodic disbursement to Plaintiffs as the construction progressed. Story contends this interpretation is inconsistent with the express provisions of the loan agreement, which allow Story to refuse an advance based on the loan-to-value ratio, regardless of whether Builders Control approved the advance for the next phase of construction. But here too, the trial court's purported error concerning which entity would control the loan proceeds is inconsequential, because the court implicitly found Story refused to make the requested advance due to a shortage of funds stemming from unrelated investment losses—not because there was an actual problem with the loan-to-value ratio.[2]

---

[2] Story also contends the court erred by relying on Builders Control's approval, while failing to make findings that Plaintiffs "were in compliance with the stated prerequisites of the Loan Contract." Insofar as Story failed to bring this purported omission to the trial court's attention in accordance with Code of Civil Procedure section 634, we must conclude the objection was waived and presume that the trial court made all factual findings necessary to support the judgment. (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 896 ["If an omission [in the statement of decision] is not brought to the trial court's attention as provided under the statute, . . . the reviewing court will resolve the omission by inferring findings in favor of the prevailing party on that issue"]; see also *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1138 ["it would be unfair to allow counsel to lull the trial court and opposing counsel into believing the statement of decision was acceptable, and thereafter to take advantage of an error on appeal although it could have been corrected at trial"].)

Finally, Story contends the court abused its discretion by refusing to admit certain exhibits into evidence. Though Story claims error with respect to several exhibits,[3] it discusses the contents of only Exhibit 62—a letter purportedly signed by Plaintiffs acknowledging that a reduction in square footage from the plans used for the original appraisal had caused the loan-to-value ratio to exceed the "original" requirement of "60%."[4] Plaintiffs denied signing the letter, and the trial court refused to receive Exhibit 62 into evidence "because it lacked foundation." We find no abuse of discretion.

Story attempted to authenticate Exhibit 62 through the testimony of Nikie Alishahi, a secretary for Story, who claimed she typed the letter and witnessed Plaintiffs sign it. The trial court determined that Alishahi "was not credible," as "she basically responded to leading questions asked by defendant Story." "Such a credibility determination is uniquely the province of the trial court. Just as we may not reweigh the evidence, we do not reassess credibility determinations." (*Ellis v. Toshiba America Information Systems, Inc*. (2013) 218 Cal.App.4th 853, 884.) Having concluded Alishahi lacked credibility, the trial court acted well within its discretion by excluding evidence she purported to authenticate.

---

[3]    Story does not discuss the contents of these other exhibits or explain how their admission would have changed the resulting judgment. In addition to providing an adequate record demonstrating error, Story's burden as appellant includes the obligation to present a reasoned argument demonstrating why a purported error has resulted in prejudice. "[O]ur duty to examine the entire cause arises when and only when the appellant has fulfilled his duty to tender a proper prejudice argument. Because of the need to consider the particulars of the given case, rather than the type of error, *the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice*." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106, italics added.) Insofar as Story simply claims error without showing prejudice, it has failed to meet its burden for reversal. (See *Santina v. General Petroleum Corp.* (1940) 41 Cal.App.2d 74, 77 ["Where any error is relied on for a reversal it is not sufficient for appellant to point to the error and rest there"].)

[4]    As Plaintiffs point out, Exhibit 62 misrepresents the original loan-to-value ratio, which was 72.6 percent at closing, based on a loan amount of $1,635,450 and an appraised property value of $2.25 million.

9

2. *The Trial Court Applied the Incorrect Measure of Damages*

We turn now to Story's claim that the trial court applied the wrong measure of damages for breach of the loan agreement. Except where otherwise expressly provided by statute, the measure of damages for a breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.) Under this general rule, "no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides." (Civ. Code, § 3358.) " ' "The basic object of damages is *compensation*, and in the law of contracts the theory is that the party injured by breach should receive as nearly as possible the equivalent of the benefits of performance. [Citations.]" ' [Citation.] A compensation system that gives the aggrieved party the benefit of the bargain, *and no more*, furthers the goal of 'predictability about the cost of contractual relationships . . . in our commercial system.' " (*KGM Harvesting Co. v. Fresh Network* (1995) 36 Cal.App.4th 376, 382, italics added.) "When an incorrect measure of damages is used, the trial court's award should be reversed and the case remanded for a retrial on the damages issue." (*Avenida San Juan Partnership v. City of San Clemente* (2011) 201 Cal.App.4th 1256, 1280 (*Avenida*).)

In calculating Plaintiffs' recoverable damages for Story's breach of the loan agreement, the trial court employed a measure of damages customarily reserved for construction contract claims based on defective or untimely construction. Using this measure, the court determined Plaintiffs were entitled to the amount "it would currently cost [Plaintiffs] to complete the construction," less the amount Plaintiffs owed Story for "the draws funded before [Story] breached the contract." In essence, the trial court's award requires Story to pay for the entire cost of construction, while requiring Plaintiffs to repay only the portion of the loan that Story funded at the time of breach. This is not the correct measure of damages for breach of a contract to lend money.

In accordance with the rule that damages are limited to losses sustained (Civ. Code, §§ 3300, 3358), "[i]t is well settled that the measure of damages for breach of a contract to lend money is not the amount agreed to be loaned." (Annot., Measure and elements of damages for breach of contract to lend money (1981) 4 A.L.R.4th 682, 686.) While only a handful of California decisions have considered the lender's liability for such a breach, courts in most jurisdictions have recognized that "in the absence of special circumstances reasonably supposed to have been within the contemplation of the parties when the contract was made, the measure of damages for breach of a contract to lend money is the difference between the interest that the borrower contracted to pay and what he was compelled to pay to procure the money elsewhere."[5] (*Ibid.* [collecting cases]; 3 Miller & Starr, 12 Cal. Real Est. (3d ed. 2013) § 36:9.) Consistent with this view, the Restatement of Contracts provides that "[d]amages for breach of a contract to lend money are measured by the cost of obtaining the use of money during the agreed period of credit, less interest at the rate provided in the contract, plus compensation for other unavoidable harm that the defendant had reason to foresee when the contract was made." (Rest., Contracts, § 343; see also 3 Miller & Starr, *supra*, 12 Cal. Real Est., § 36:9; Rest.2d Contracts, § 351, com. E, p. 140 [recognizing, "[b]ecause credit is so widely available," in most cases "the lender's liability will be limited to the relatively small additional amount that it would ordinarily cost to get a similar loan from another lender," unless "the lender has reason to foresee that the borrower will be unable to borrow elsewhere or will be delayed in borrowing elsewhere"].)

---

[5] As the American Law Reports article explains, other courts have held that "ordinarily the damages for breach of a contract to lend money cannot be more than nominal, since usually the money may be procured elsewhere at the same rate and without loss to the intending borrower." (Annot., Measure and elements of damages, *supra*, 4 A.L.R.4th at p. 686.)

Additionally, as the foregoing authorities recognize, an aggrieved borrower also may recover special damages if the lender knew facts making a greater loss probable, and the borrower is unable to procure substitute financing. (25 Williston on Contracts (4th ed. 2014) § 66:101.) Thus, if the lender knew or reasonably expected the borrower to make outlays or incur liabilities in reliance on the agreement to furnish financing, the borrower may recover whatever was lost as a consequence of such expenditures and liabilities upon the lender's breach. (*Id.* at p. 99.) Likewise, where the lender breaches a contract to lend money for a particular venture, and substitute financing cannot be obtained, the borrower may recover the profits from the venture that the lender reasonably contemplated when making the loan commitment, so long as such profits are capable of reasonable ascertainment and are not too speculative. (*Id.* at pp. 98-101; see *Hunt v. United Bank & Trust Co.* (1930) 210 Cal. 108, 116-117 (*Hunt*) [where lender breached contract to advance money for farming purposes from which the parties contemplated a profit would result, proper measure of damages included the lost profits suffered by the borrower]; *Landes Const. Co., Inc. v. Royal Bank of Canada* (9th Cir. 1987) 833 F.2d 1365, 1372-1373 [lost profits from breach of a construction loan commitment were too speculative to allow expert testimony concerning such profits].)

As we have explained, in awarding Plaintiffs the amount it would have cost to complete construction, while requiring them to repay only a fraction of the financing Story agreed to provide, the trial court applied the wrong measure of damages. Plaintiffs contracted to *borrow* money from Story—not to have Story pay the costs of construction—and Plaintiffs were required to repay the funds they borrowed, together with interest at the rate set forth in the loan agreement. In the event Plaintiffs can obtain a substitute loan, they are entitled to the additional financing costs incurred above the agreed upon interest rate, plus consequential damages caused by Story's breach,[6] less the amount owed to Story for the loan advances Plaintiffs received. Alternatively, in the

---

[6]    Based on the record, such consequential damages will likely include, but may not necessarily be limited to, the costs to secure new financing, obtain new permits and repair damage caused to the existing construction as a result of the interruption in financing.

12

event Plaintiffs are unable to secure substitute financing, the trial court may find Story knew of the loan's purpose and reasonably contemplated the profits Plaintiffs would realize from selling the improved property. Should the court find these profits are reasonably ascertainable and not too speculative, Plaintiffs may be entitled to these lost profits as an item of special damages. (See *Hunt, supra,* 210 Cal. at pp. 116-117.) We express no opinion as to whether the evidence will support an award of special damages in this case. As we cannot resolve these factual issues on appeal, damages must be retried.[7] (See *Avenida, supra,* 201 Cal.App.4th at p. 1280.)

## DISPOSITION

The damages award is reversed and the matter is remanded for a retrial of the damages issue. In all other respects the judgment is affirmed. In the interest of justice, the parties shall bear their own costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



KITCHING, J.

We concur:



KLEIN, P. J.



ALDRICH, J.

---

[7] Because either measure of damages will account for the repayment of the funds already advanced by Story, it was appropriate for the trial court to cancel the deed of trust.